E-FILED
Monday, 10 February, 2020  04:08:14 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| AMIT SINHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  18-cv-01319-MMM-JEH |
| | ) | |
| BRADLEY UNIVERSITY, | ) | **Plaintiff demands trial by jury.** |
| | ) | |
| Defendant. | ) | |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff, AMIT SINHA, by and through his attorneys, JULIE L. GALASSI, and HASSELBERG, ROCK, BELL & KUPPLER, LLP, states the following for his Response to Defendant's Motion for Summary Judgment:

<u>Introduction</u>

Sinha became Chair of the FQM department of the Bradley Business College in 2013. Of the nine full time faculty members, five were 65 years of age or older. The previous Chair of 18 years, Philip Horvath, was 72 years of age. Dean Darrell Radson ("Radson") had been appointed Dean the previous year. Radson asked older faculty to retire without regard to their teaching skills, research efforts, publishing successes and other contributions to the University. Radson made repeated statements to Sinha about ways to get the older faculty to retire. Radson made several demands on Sinha to exercise his powers as Chair to make the older faculty member's work life difficult so they would retire. Sinha opposed using his powers as

Chair to do so. Radson was able to use his authority as Dean to get rid of one older department member and harass others.

Following Sinha's refusal to change a course in mid-2016 so an older faculty member would have a difficult schedule, a female faculty member, Patricia Hatfield, filed a grievance against Sinha which contained false allegations about Sinha and his performance as Chair. During the investigation of the grievance, Hatfield made false accusations about Sinha and the department. Radson verified these false allegations to the grievance committee and made his own false statements about Sinha opining that his removal as Chair was necessary. Based upon this information, the committee report accepted Hatfield and Radson's claims and adopted the recommendation to remove Sinha as Chair.

Because the committee report made several references to Hatfield's claim of sex discrimination, the Provost called for a Title IX investigation. During the investigation, Hatfield and Radson repeated the false statements about Sinha and the department. Radson admitted he used Hatfield's accusations to obtain Sinha's removal. The Title IX report adopted Hatfield and Radson's (false) assessment of Sinha and the department. As a result, the Provost met with Radson about the report and Sinha was removed as Chair.

Radson's hand-picked successor Chair admitted she would do Radson's bidding and used her Chair authority to perform tasks Sinha had refused to do.

Shortly after Sinha filed a charge of discrimination, he submitted his second application for promotion to full professor in the fall of 2017. Despite having been told he had the credentials for promotion by Radson and the Provost, his application was denied.

Sinha's removal as Chair and promotion denial were motivated by discriminatory animus in violation of the anti-retaliation provisions of the ADEA.

Sinha's response is exclusive to Count II as Sinha intends to dismiss Count I.

### Response to Undisputed Material Facts

### Undisputed Material Facts

1.     Sinha was hired as an employee by Bradley in August of 2008 and was promoted to the position of associate professor in 2012.  (Sinha Dep., pp. 8-9)

2.     Sinha was elected Chair of the FQM Department during the 2012-2013 academic year, effective August 2013.  (Sinha Dep., p. 9)

3.     Dean Radson ratified Sinha's election as Chair of the FQM Department.  (Sinha Dep., p. 9)

4.     Sinha was re-elected Chair of the FQM Department during the 2015-2016 academic year, effective August 2016.  (Sinha Dep., p. 9)

5.     Dean Radson ratified Sinha's re-election as Chair of the FQM Department in 2016.  (Sinha Dep. 1, p. 149)

6.     In the fall semester of 2016, Sinha applied for promotion to the position of full professor.  (Sinha Dep., pp. 9-10)

7.      On January 20, 2017, Dean Radson wrote to Sinha to inform him that he was not recommending approval of Sinha's 2016 promotion application because he did not find that Sinha met the required "rare and extraordinary circumstances" standard that had to be met because Sinha had not yet served for five years in his then current rank of associate professor.  (Sinha Dep., p. 175 and Ex. 37)

8.      On March 1, 2017 Dean Radson sent an email message to Sinha informing him that Provost Zakahi was denying Sinha's 2016 application for promotion to full professor, and, on March 5, 2017, Sinha acknowledged receipt of that message.  (Sinha Dep., Ex. 11, p. Plt's 000237)

9.      In the fall semester of 2016, Professor Patricia Hatfield, a faculty member in the FQM Department, filed a grievance against Sinha with Bradley's Faculty Grievance Committee alleging discrimination on the basis of sex.  (Sinha Dep., pp.5-6; Zakahi Dep. pp. 12-17 and Ex. 1)

10.      The Faculty Grievance Committee is a body elected by Bradley faculty members to hear faculty grievances.  (Sinha Dep., p, 5; Zakahi Dep. p. 12)

11.      The Faculty Grievance Committee declined to hold a formal hearing on Professor Hatfield's grievance because it thought that such a "... process would be drawn out, exceedingly ugly, and would only create further animosity among the current faculty..." of the FQM Department.  (Zakahi Dep., Ex. 1, p.1)

12.      The Faculty Grievance Committee reported to Bradley President Gary Roberts that the FQM Department had "... a long history of dysfunction in faculty

relations and departmental leadership. This dysfunctionality has developed into schismatic factionalism and open hostility." (Zakahi Dep., Ex. 1, p.1)

13.     The Faculty Grievance Committee proposed to President Roberts as one option to resolve Professor Hatfield's grievance that Sinha be removed as Chair of the FQM Department.  (Amended Response to First Request to Admit to Plaintiff, ¶ 1)

14.     Due to concerns of possible sex discrimination, Provost Zakahi referred Professor Hatfield's grievance for a Title IX investigation. (Zakahi Dep., pp. 15-16)

15.     A report of the Title IX investigation issued on February 21, 2017 found the preponderance of the evidence did not establish that the matters that were the subject of Professor Hatfield's grievance constituted a Title IX violation. (Zakahi Dep., Ex. 2)

16.     The Title IX investigators also found, however, that dysfunction plagued the FQM Department and that: "These overarching issues have created the dysfunctional environment that is present today.  Additionally, it is our concern that this environment will remain in effect going forward unless the Dean of the Foster College of Business and the Provost and Senior Vice President for Academic Affairs take steps to implement changes that will address and mitigate the issues that are within their purview."  (Zakahi Dep., Ex. 2, p. 3; Second Amended Response to First Request to Admit to Plaintiff, ¶ 2)

17.    Upon consideration of the reports from the Faculty Grievance Committee and the Title IX investigators, Provost Zakahi determined to remove Sinha as Chair of the FQM Department. (Zakahi Dep., pp. 41-43)

18.    Sinha admits that it was Provost Zakahi who made the decision to remove Sinha as Chair of the FQM Department but claims generally that Provost Zakahi was provided false information about Sinha. (Second Amended Response to First Request to Admit to Plaintiff, ¶ 13)

28.    Asked if what happened in the FQM Department was that people carried grievances for a long time and people doing that lead to no end to anything and situations went from bad to worse, Sinha stated: "Well, I got fired as Chair so the answer is yes."

34.    On July 31, 2017, Sinha filed a Charge of Discrimination with the IDHR and the EEOC alleging his removal as Chair of the FQM Department was the result of discrimination on the basis of sex, national origin, and discrimination, but that Charge did not include any allegations about the denial of his promotion application for the position of full professor on March 1, 2017. (Sinha Dep., p. 164 and Exh. 24)

35.    On February 28, 2018, Sinha filed a Charge of Discrimination with the IDHR and the EEOC alleging "[f]ailure to promote on September 22, 2017, in retaliation for filing a charge of discrimination with the IDHR/EEOC." (Sinha Dep., p. 163 and Ex. 21)

## Undisputed Immaterial Facts

19.     There is no direct evidence that Sinha was removed as Chair of the FQM Department because of his sex.  (Second Amended Response to First Request to Admit to Plaintiff, ¶ 6 and Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 8. While Plaintiff denied the Request to Admit, his purported factual basis for doing so demonstrates that he has no such direct evidence.) **Defendant's Material Fact is immaterial because Plaintiff intends to dismiss his Title VII claim.**

20.     There is no direct evidence that Sinha was removed as Chair of the FQM Department because of his statutorily protected conduct.  (Second Amended Response to First Request to Admit to Plaintiff, ¶ 8 and Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 10.  While Plaintiff denied the Request to Admit, his purported factual basis for doing so demonstrates that he has no such direct evidence.) **Defendant's Material Fact is immaterial because Plaintiff is not required to present direct evidence to establish a cause of action. "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).**

21.     There is no direct evidence that Sinha was denied promotion because of his sex.  (Second Amended Response to First Request to Admit to Plaintiff, ¶ 7 and Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 9. While Plaintiff denied the Request to Admit, his purported factual basis for doing so

demonstrates that he has no such direct evidence.) **Defendant's Material Fact is immaterial because Plaintiff intends to dismiss his Title VII claim.**

22.     There is no direct evidence that Sinha was denied promotion because of his statutorily protected conduct.  (Second Amended Response to First Request to Admit to Plaintiff, ¶ 9 and Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 11.  While Plaintiff denied the Request to Admit, his purported factual basis for doing so demonstrates that he has no such direct evidence.) **Defendant's Material Fact is immaterial because Plaintiff is not required to present direct evidence to establish a cause of action. "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'"** *Ortiz v. Werner Enters., Inc.*, **834 F.3d 760, 765 (7th Cir. 2016).**

23.     There is no factual basis to support a contention by Sinha that Provost Zakahi did not act with the honest belief that Sinha's removal as Chair of the FQM Department was necessary to attempt to improve the functioning of the Department.  (Second Amended Response to First Request to Admit to Plaintiff, ¶ 14 and Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 16.  Plaintiff refused to admit or deny the Request to Admit because "... he has no way to verify whether or not Provost Zakahi had an honest belief regarding his removal.  Thus, Plaintiff avoided having to provide a factual basis for a denial of the Request to Admit, but effectively admitted that he cannot challenge whether Provost Zakahi had such an honest belief.) **Defendant's Material Fact is immaterial**

because Plaintiff is not required to present direct evidence to establish a cause of action. "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Defendant's Material Fact is immaterial because if a supervisor makes false and misleading reports to a decision maker motivated by illegal retaliatory animus and those false and misleading reports caused Sinha's termination, the Defendant is liable. *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011)

24.    Provost Zakahi made the decision to deny Sinha's application for promotion to full professor which Sinha initiated in August of 2016. (Second Amended Response to First Request to Admit to Plaintiff, ¶ 15) Defendant's Material Fact is immaterial because if a supervisor makes false and misleading reports to a decision maker motivated by illegal retaliatory animus and those false and misleading reports caused Sinha's termination, the Defendant is liable. *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011)

25.    There is no factual basis to support a contention by Sinha that Provost Zakahi did not act with the honest belief that Sinha's August 2016 application for promotion did not meet the standards for promotion set forth in Bradley's Faculty Handbook. (Second Amended Response to First Request to Admit to Plaintiff, ¶ 16 and Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 18. Plaintiff refused to admit or deny the Request to Admit because "… he has no way to verify whether or not Provost Zakahi had an honest belief regarding his removal

9

[*sic*].  Thus, Plaintiff avoided having to provide a factual basis for a denial of the Request to Admit by saying he "... cannot speculated [*sic*] about another person's beliefs.) **Defendant's Material Fact is immaterial because if a supervisor makes false and misleading reports to a decision maker motivated by illegal retaliatory animus and those false and misleading reports caused Sinha's termination, the Defendant is liable.** *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011)

26.     Asked what information he had showing that Provost Zakahi was motivated to act against him because of his sex, Sinha admitted that his information was limited to (a) the Provost had initiated the Title IX investigation due to Professor Hatfield's grievance and (b) a claim that Nena Peplow, Bradley's Director of Human Resources, was not recommending his removal as Chair.  (Sinha Dep., pp.149-50; Zakahi Dep. 32; *See* Second Amended Response to First Request to Admit to Plaintiff, ¶ 10) **Defendant's Material Fact is immaterial because if a supervisor makes false and misleading reports to a decision maker motivated by illegal retaliatory animus and those false and misleading reports caused Sinha's termination, the Defendant is liable.** *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011)

27.     Asked what information he had showing that others at Bradley did not honestly hold the view that the FQM Department was dysfunctional and that he was unable to solve the problem and needed to be removed as Chair, Sinha admitted that his information was limited to (a) while there was a perception that the Department was dysfunctional, he did not agree with that, and he thought that

the perception he could not solve problems and needed to be removed was not honest, (b) Nena Peplow mentioned to him that at the conclusion of the Title IX investigation his removal as Chair was not being recommended, and (c) nobody ever gave him a reason why he needed to be removed as Chair. (Sinha Dep., pp. 146-47) **Defendant's Material Fact is immaterial because after Plaintiff's deposition in May 2019, Defendant produced documents in discovery showing Hatfield and Radson made numerous false statements to others that were used to form opinions about the department.**

29. Asked if he contended that any Bradley employee who was not male received more favorable treatment in circumstances comparable to those alleged in Count I, Sinha gave an answer that purported to identify such individuals, but, on its face, Sinha's vague and disjointed answer is insufficient to identify any such person. (Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 1) **This fact is immaterial for the reason that Plaintiff's intends to dismiss his Title VII claim.**

30.   Asked if he contended that any Bradley employee similarly situated to him who did not oppose discrimination received more favorable treatment in circumstances comparable to those alleged in Count II, Sinha gave a non-responsive answer identifying only Dean Radson and his successor as Chair Professor Highfill without providing any facts, making only unsupported allegations instead. (Plaintiff's Answers to Defendant's First Set of Interrogatories-Amended No. 2)

Defendants material fact is immaterial because Sinha is not required to show comparables to establish illegal retaliation.

31.     Sinha was the only department Chair at Bradley whose possible removal had been proposed by the Faculty Grievance Committee in 2016 or 2017. (Second Amended Response to First Request to Admit ¶ 3) **Defendant's Material Fact is immaterial because Sinha was the only Chairperson named in a faculty grievance in 2016 or 2017.**

32.     In 2017, the FQM Department was the only Department at Bradley that, after investigation, had been found to be dysfunctional. (Second Amended Response to First Request to Admit ¶ 5) **Defendant's Material Fact is immaterial because Radson and Hatfield falsely told investigators that the department was dysfunctional and their opinions were repeated in the investigation report.**

33.     Sinha has no information that any member of the Faculty Grievance Committee was prejudiced against him. (Sinha Dep., pp. 6-8) **Defendant's Material Fact is immaterial because if a supervisor makes false and misleading reports to a decision maker motivated by illegal retaliatory animus and those false and misleading reports caused Sinha's termination, the Defendant is liable. *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011)**

Additional Material Facts

**A. Radson's statements of his desire to rid the FQM Department of older faculty.**

1.     After Sinha became Chair of the FQM department, Radson told him that he wanted older faculty members to retire. Members of Sinha's department

were significantly older than those of other departments. Five of nine faculty were 65 years or older. (Sinha Dep. Ex. 1, pg. 11, 25, Sinha Affidavit, Ex. 6)

2.    Allen Webster's employment with Bradley University began in May 1990 and ended in June 2019 when he was 75 years of age. He was a tenured professor in the Finance and Quantitative Methods Department.  (Webster Affidavit, Ex. 2)

3.    In May 2012, when Radson was hired as the Dean of the College of Business, Webster was on sabbatical. (Webster Affidavit, Ex. 2)

4.    Upon Webster's return from sabbatical, he requested a meeting with Radson to learn of his plans for the college. Radson spent the entire time of the meeting trying to convince Webster of the virtues of retirement. Radson said that if he was Webster, at Webster's age, he would retire. (Webster Affidavit, Ex. 2)

5.    During the meeting, Radson asked Webster if he liked to fish and if he played golf. He told Webster about many of his friends who enjoyed retirement even though they were younger than Webster. At the end of the meeting, Radson leaned back in his Chair, put his hands behind his head and said, "let's just talk here not as Dean and you, but just as friends." Radson then further tried to interest Webster in the pleasurable pursuits of retirement. Upon leaving the meeting with him, Webster said it sounds as if you are trying to get rid of me. (Webster Affidavit, Ex. 2)

6.    Radson told Sinha that Professor Rubash (over the age of 65) would never retire if he was allowed to teach online courses - he could teach from Florida.

Rubash had been teaching online courses before Sinha came to Bradley. (Sinha Dep. Ex. 1, pg. 11-12, 43, 111)

7. Having an online course means all the preparations are completed by the professor before the semester starts where most preparations for in class courses are done as the semester unfolds, so it would have been more difficult on Rubash to prepare for 4 in class courses. (Sinha Dep. Ex. 1, pg. 110)

8. Radson told Sinha several times that Professor Webster (over the age of 65) should retire even though his performance was more than adequate and his research was productive. Radson said if Webster retired, he could go fishing. Sinha told Radson that the University was Webster's main engagement and it was morally reprehensible to pressure him to retire. (Sinha Dep. Ex. 1, pg. 28, 30)

9. Phillip Horvath has been a faculty member at Bradley University since 1977 and from 1994 to 2013, he served as the department Chair in the FQM department. (Horvath Affidavit, Ex. 3)

10. In Horvath's first conversations with Radson, Radson talked about Horvath's retirement and urged him to do so. At that time, Horvath was over 72 years old. (Horvath Affidavit, Ex. 3)

**B. Radson's discriminatory actions to rid the FQM Department of older faculty. Professor Horvath's experience with Radson.**

11. Horvath said that for many years he managed as the Stevenson Chairmanship which served to bring speakers to the community. Out of the blue, Radson went to his office and said the position was eliminated. Horvath asked

14

about the upcoming speaker he had arranged and Radson said to cancel it. Horvath lost the stipend income as a result. (Horvath Affidavit, Ex. 3)

12.     Horvath said that after Sinha was removed as Chair March 22, 2017, Janett Highfill was appointed even though she had been presumably passed over more than once in her own department and during his time at Bradley University she had never been department Chair. Highfill admitted to Horvath that she was not qualified and would use a "blanket" statement in performance assessment and a standard rating system to manage the FQM discipline and informed him that she would do Radson's "bidding." (Horvath Affidavit, Ex. 3)

### Instructor Crowe's experiences with Radson.

13.     Douglas Crowe ("Crowe") worked for Bradley University for twenty-eight years serving as assistant dean of international business programs, assistant to the dean for undergraduate programs, assistant professor, and instructor in the Finance and Quantitative Methods Department. (Crowe Affidavit, Ex. 4)

14.     In April 2015, Crowe was 63 years old. (Crowe Affidavit, Ex. 4)

15.     On April 15, 2015, Bradley offered Crowe a contract through December 19, 2015. Dean Darrell Radson was over the department. (Crowe Affidavit, Ex. 4)

16.     Because Crowe did not receive a contract for after December 19, 2015, he met with the Faculty Ombudsman, and per her recommendation, requested a review of this decision with Bradley's Tenure, Promotion, and Dismissal Committee (the "TPDC"). (Crowe Affidavit, Ex. 4)

17.     In Crowe's review request he said Bradley did not offer him a contract because of his age. (Crowe Affidavit, Ex. 4)

18.     Bradley's faculty handbook tasks the TPDC with considering claims that a non-tenured faculty member's non-reappointment resulted from discrimination. (Crowe Affidavit, Ex. 4)

19.     After Crowe filed his request for review with the TPDC, but before the TPDC responded, Bradley had a re-accreditation visit from the Association of Advance Collegiate Schools of Business ("AACSB") in November 2015. The AACSB scheduled a meeting with all non-tenure track faculty, except Crowe because he was omitted from its list of faculty. (Crowe Affidavit, Ex. 4)

20.     On December 14, 2015, the TPDC made three recommendations to Bradley in response to Crowe's request for review: (1) seek legal guidance regarding Crowe's claim of age discrimination; (2) provide a written rationale for his non-reappointment; and (3) provide Crowe with a contract for the Spring 2016 semester. (Crowe Affidavit, Ex. 4)

21.     Bradley responded to the TPDC's recommendation by providing Crowe a contract for the Spring 2016 semester which included the following condition:

> By accepting this contract, [Crowe] acknowledge[s] that it is a terminal contract. No future contracts for [Crowe's] employment at Bradley University will be approved, and [Crowe] may not rely on a proposal, recommendation, promise, or statement by anyone to the contrary. (Crowe Affidavit, Ex. 4)

22.     Crowe was never provided a written rationale or any rationale for his non-reappointment. (Crowe Affidavit, Ex. 4)

23.     In Crowe's twenty-eight years of service at Bradley, Bradley never requested, let alone required, that Crowe sign a contract containing the above language or anything similar. (Crowe Affidavit, Ex. 4)

24.     In January 2016, Bradley granted retroactive raises to the faculty for the prior two years. Crowe did not receive such a raise. (Crowe Affidavit, Ex. 4)

25.     On January 29, 2016, Crowe emailed Bradley's Chair of Finance and Quantitative Methods to apply to teach four quantitative methods courses that did not have an instructor as of that date. (Crowe Affidavit, Ex. 4)

26.     On February 2, 2016 Crowe was informed that he could not apply for employment with Bradley and would not be considered for the open position. (Crowe Affidavit, Ex. 4)

27.     On April 22, 2016, the American Association of University Professors (the "AAUP") wrote Bradley's president regarding Crowe's terminal contract. (Crowe Affidavit, Ex. 4)

28.     The AAUP is a professional organization that defends academic freedom, advocates collegial governance, and develops policies that insure due process. Bradley has an AAUP chapter, and its president regularly meets with Bradley's president to discuss academic freedom, collegial governance, and the development of due process compliant policies. Bradley's handbook references AAUP standards at least four different times. (Crowe Affidavit, Ex. 4)

29.     The AAUP advised that Bradley should continue to employ Crowe until May 2018 (his projected retirement date). The AAUP also concluded that "in

the absence of such a contract proffer [*sic*], that Mr. Crowe be given specific reasons why he was offered a terminal contract." (Crowe Affidavit, Ex. 4)

30.     Despite the TPDC and AAUP's recommendations, Bradley refused to provide Crowe with a rationale. (Crowe Affidavit, Ex.4)

31.     Younger employees in Crowe's department were not required to condition their acceptance of a teaching contract for the Spring 2016 semester on their non-receipt of future contracts. (Crowe Affidavit, Ex. 4)

32.     For the 2016-2017 school year, Crowe's department filled at least one full-time, non-tenure track position with a younger candidate that teaches courses Crowe had previously taught for Bradley. (Crowe Affidavit, Ex. 4)

33.     Following Crowe's complaint to the TPDC, Radson required Crowe to move his office three times and was told he would be relocated to the basement. (Crowe Affidavit, Ex. 4)

34.     Crowe filed suit against Bradley for age discrimination and retaliation which was resolved to his satisfaction. (Crowe Affidavit, Ex. 4)

35.     After Crowe was refused future employment and given a terminal contract, Radson rejected a course schedule for a younger faculty member because the proposed schedule showed the justification for getting rid of Crowe was false. (Sinha Dep. Ex. 1, pg. 79-80, 82)

36.     Sinha had proposed a 3-hour course that Crowe normally would have taught, but Radson said if Sinha assigned the course their justification for getting rid of Crowe would fail. Sinha told Radson he had not wanted Crowe removed.

18

Sinha opposed Radson because of Radson's disposition toward his faculty members. (Sinha Dep. Ex. 1, pg. 85-86)

### Professor Webster's experiences with Radson.

37.     On or about August 17, 2016, while Webster was talking to the Associate Dean, Radson burst into his office and threw a stack of papers on Webster's desk causing them to scatter among the papers that he already had on his desktop. Radson said, "if there's one thing you are Webster, it's consistent." The papers related to materials from an earlier meeting that week. Radson then said, "I want a report on these papers by Monday if you are smart enough to understand them!" Later that afternoon Webster approached Radson and told Radson he had offended him, especially since his comments were made in front of a colleague. Radson did not apologize, he simply made more insulting comments to Webster. (Webster Affidavit, Ex. 2)

38.     That night on or about August 17, 2016, Webster suffered a heart attack and was found in the men's room on the second floor of Baker Hall. Webster was off work until the 2017-2018 academic year. (Webster Affidavit, Ex. 2)

39.     The new Chair, Highfill, told Sinha she was just doing what Radson asked her to do and decisions about the department were being made by Radson and the associate dean. (Sinha Dep. Ex. 1, pg. 126, 127)

40.     Chair Highfill harassed Webster just as Radson did. Prior to the start of the fall 2017 semester, Webster provided notice to Bradley and Chair Highfill that he was not released to return to work by his cardiologist until the first day of

classes, August 22, 2017. Chair Highfill placed continued and unrelenting pressure to explain Webster's absence before classes started. She sent Webster emails demanding to know why he preferred to follow his cardiologist's advice and to wait until the start of classes before assuming full duties. Webster explained to her with each email why he felt that might be a wise course of action to follow. In her last email Highfill said, "You still haven't answered the question." Webster replied that yes, indeed, he had and referred her to his previous emails. (Webster Affidavit, Ex. 2)

41.    In August 2017, the department moved from Baker Hall to Campus Town. Webster's small refrigerator in his office in Baker Hall was relocated to the new location by Bradley employees. After the move, Radson called Webster into his office demanding Webster move the refrigerator. Webster told him that he could not do it by himself. Radson repeatedly asked who owned it despite the fact that Webster told him it was his. (Webster Affidavit, Ex. 2)

42.    Then Webster was approached by Highfill demanding to know when Webster would move the refrigerator. Webster inquired as to what problem it might be causing but received no answer and was simply told again in a rude and demanding manner to "Move it!" (Webster Affidavit, Ex. 2)

43.    Due to the fact that Webster was returning to campus after a ten-month medical leave for cardiac issues, he replied that he really could not move it, but if someone in the custodial service or similar capacity were to move it to the back room in campus town, that would be fine. There is sufficient room to store the

refrigerator in the back area, and, in the future if anybody wanted to use it, they would be most welcome to do so. Highfill, again in a demanding tone, informed Webster that that was, "Unacceptable." Webster again inquired as to the nature of her objection but was merely met with further harsh demands to move the refrigerator. More words were exchanged, and Highfill headed off to Dean Radson's office. (Webster Affidavit, Ex. 2)

44.    Highfill followed Radson's directives in running the department. Highfill informed Webster that his teaching schedule was going to be drastically changed, but she would not say what the changes were. In complete violation of standard academic procedure, Highfill assigned Webster to teach two of the lowest, most basic statistics classes offered and another class that had nothing to with Bradley's basic curriculum. When Webster questioned Highfill about the reason for the change she lied to him. There were numerous instances where Highfill would insult Webster at department meetings such as calling him unprofessional. (Webster Affidavit, Ex. 2)

45.    Due to the stress and harassment from Radson and Highfill, Webster left Bradley in June 2019 and filed an age discrimination charge in September 2019, which was settled with Bradley. (Webster Affidavit, Ex. 2)

### Rubash's experiences under Radson .

46.    Sinha scheduled Rubash to teach course FIN 323 online which was changed to an in-class course after Sinha was removed as Chair. (Sinha Dep. Ex. 1, pg. 14-15)

47.     Radson demanded that Rubash's online course undergo a quality review process which was not required for other faculty members. (Sinha Dep. pg. 18-20)

48.     Radson refused to approve sabbatical leave for Horvath and Rubash because they would have to remain employed for a year after the end of the leave. The administration has the final say as to whether leave is granted. (Sinha Dep. Ex. 1, pg. 65, 67)

49.     Radson told Sinha the faculty committee did not recommend granting the sabbatical requests for the same reason he disapproved the requests. (Sinha Dep. Ex. 1, pg. 71)

**Bhandari's experiences under Radson.**

50.     Sinha was directed in a meeting with Radson and Jason Garrett, Associate Dean, to give Professor Bhandari (over the age of 65) a difficult course schedule, but if he repeated what was said it would be denied.  In another conversation, Garrett told Sinha the best way to get faculty to retire was to assign an early morning and evening class so it would be difficult to keep up with the schedule. (Sinha Dep. Ex. 1, pg. 45-49, 100-101)

**C. Sinha's efforts to protect the older faculty**

51.     Sinha supported Crowe's application to teach the courses, Dean Radson did not. (Crowe Affidavit, Ex. 4)

52.     Sinha was protective of faculty members in the department and would not hesitate to stand up to administration officials for his faculty. When Webster

told Sinha about Radson's behavior and attempts to get Webster to retire. Sinha encouraged Webster to file a grievance and that Sinha was going to complain directly to Radson. Sinha told the associate dean to tell Radson that he needed to apologize to Webster. (Webster Affidavit, Exhibit 2, Sinha Dep. Ex.1, pg. 112)

53.     Sinha gave Rubash an online course despite Radson's direction not to. (Sinha Dep. Ex. 1, pg. 14-15)

54.     Sinha disregarded Radson and Garrett's request to assign Bhandari a difficult schedule. (Sinha Dep. Ex. 1, pg. 106)

55.     Sinha avoided Radson because he was tired of hearing Radson talk about faculty who needed to retire, Webster's heart problems or Rubash's online courses. (Sinha Dep. Ex. 1, pg. 78)

56.     Radson wanted to get rid Webster, Rubash, Horvath and Bhandari and Sinha was not going along with it. (Sinha Dep. Ex. 1 pg. 96)

### D. Radson's use of Hatfield's false complaint of discrimination and ineffectiveness to smear Sinha and cause his removal.

57.     Radson was well aware that Hatfield's complaints about Sinha stemmed from the fact that Hatfield sided with the Dean on curriculum and not supporting the objectives of the department. (Crowe Affidavit, Ex. 4)

58.     As Chair of the FQM department beginning August 2013, Sinha repeatedly had negative interactions with Radson and the Associate Dean Garrett because he would not undertake certain actions as Chair to make life difficult for the oldest members of the department so they would retire. (Sinha Affidavit, Ex. 6)

59.     Shortly after Sinha opposed Radson's efforts to deny Rubash an online course, Patricia Hatfield, a tenured full professor, filed a grievance against him. After the Grievance Committee interview, a Title IX investigation was commenced to determine whether Sinha and/or male faculty members had discriminated against Hatfield. (Sinha Affidavit, Ex. 6)

60.     In a Spring 2016 meeting with Radson and Associate Dean Garrett, Sinha told them that senior faculty in the department like working with him and are not likely to retire while Sinha was the Department Chair. Further, Sinha told them that Horvath perceived a lot of hostility towards him, and at least in his assessment, Horvath probably would not retire if Sinha's career would be adversely affected by Horvath's absence. (Sinha Affidavit, Ex. 6)

61.     Sinha was never provided the grievance or the underlying documentation and the Title IX investigation documents until after his deposition. (Sinha Affidavit, Ex. 6)

62.     From Sinha's review of the Grievance Committee records, only he, Radson and Hatfield were interviewed. (Sinha Affidavit, Ex. 6, Ex. A., Committee Log, pg. 376-380, 382-384, 386-389)

63.     Hatfield made numerous false and misleading statements to the Grievance Committee.

       a. Hatfield claimed she had made a schedule request change in 2015 to attend the Senate that was denied by Sinha. That is untrue. (Sinha Affidavit, Ex. 6)

b.  Hatfield claimed when she pointed out the pertinent handbook provision, Sinha called her obnoxious. In fact, when she pointed out the provision, she then said, "I have you in a corner now, don't I?" Sinha told her not to be obnoxious. (Sinha Affidavit, Ex. 6)

c.  Hatfield claimed Sinha told her that she needed to make sure Professor Elshahat did not get tenure. This is not true. Sinha told Hatfield he was concerned Elshahat was not a good fit. (Regardless, under the tenure criteria Elshahat qualified and Sinha would vote for him and recommend him for tenure and promotion.) (Sinha Affidavit, Ex. 6)

d.  Hatfield claimed Sinha had not consulted her in the planning of her semester schedules <u>after he became Chair in 2013.</u> This is not true. As with all other faculty members, Sinha consulted about the courses Hatfield wanted to teach and provided her with proposed schedules. (Sinha Affidavit, Ex. 6, See Exhibit B., emails over the years to Hatfield regarding her teaching schedules)

e.  Hatfield told the committee that Sinha's removal would not solve the problem as there was "contamination within the department." This is false. There was no substantive change within the department from Horvath's tenure as Chair for 18 years to Sinha's tenure. Hatfield never made a complaint or described the

department as she did until after she lost the election. (Sinha Affidavit, Ex. 6)

    f.   The essential focus of Hatfield's complaint was that she had been mistakenly scheduled for 4 teaching days of classes. Once it became known, Sinha offered to teach the extra class and Radson refused to allow him to do so to help Hatfield's schedule. Other male members of the department had to bear such a schedule without Chair intervention to reduce the teaching load. (Sinha Affidavit, Ex. 6)

64.    At the grievance committee Radson made multiple false statements to the committee. Radson stated Sinha was negative about changing anything when a mistake was made in 2016 resulting in Hatfield having four teaching days of classes. Radson wanted Sinha to change multiple professors' schedules to accommodate Hatfield. Sinha's proposal was for him to take Hatfield's class and teach it himself, so multiple professors would not be inconvenienced. Further Radson was well aware that students had already registered and many of them sign up to take classes from specific professors so Radson's option would not have benefited the students. (Sinha Affidavit, Ex. 6)

65.    Radson rejected Sinha's offer to teach the class to resolve Hatfield's complaint. (Sinha Affidavit, Ex. 6)

66.    At no time did Sinha ever make a statement in front of Radson or Hatfield about a "chain of command". The only statement he made remotely like this was when he indicated that things would be easier if Hatfield came to him first

when she had a problem instead of him hearing about it second and third hand from other individuals. (Sinha Affidavit, Ex. 6)

67.   Radson told the committee that Sinha could not fulfill his responsibility as Chair and he would not support Sinha. The only disagreements or conflicts that Sinha had with Radson as of September 30, 2016 were his attempts to use Sinha to force older faculty members to retire. (Sinha Affidavit, Ex. 6)

68.   Radson made a statement that other faculty came to him and said there was no way Sinha could remain as Chair but they changed at the time of election. Radson failed to tell the committee that the 2016 election was uncontested. (Sinha Affidavit, Ex. 6)

69.   Radson labeled Sinha as inflexible to the committee on September 30, 2016 citing his decision to retain Professor Elshahat teaching FIN 622 instead of following Radson's direction to allow Hatfield to teach the class. There was documentation that Elshahat was a superior teacher to Hatfield and Radson lied to the committee stating there was not. (Sinha Affidavit, Ex. 7)

70.   Radson told the committee that everything Hatfield had said that he had been involved in was accurate, which was also false as set forth in Sinha's affidavit (Sinha Affidavit, Ex. 6)

71.   As set forth below, Radson made numerous false and derogatory comments during his interview with the investigators for the potential Title IX violation. (Sinha Affidavit, Ex. 6, Ex. C., Doc. 141-148)

a.  Radson described Sinha's Chair performance as going downhill.
    In fact, the only problem he had with Sinha's performance was
    that Sinha would not follow his directives in order to force
    faculty members to retire.

b.  At no time did Sinha ever say the words "I'm Chair and I can do
    it". Likewise, Radson at no time said, "just because you can does
    not mean you should."

c.  Radson claimed Sinha was inconsistent with Hatfield. That is
    false because Webster, Horvath, and Crowe all attest to the
    fair manner in which Sinha treated all faculty, including
    Hatfield.

d.  Radson falsely stated that course scheduling had been an issue
    with Sinha. That is false. There was the one issue with Hatfield.
    Initially when the problem arose Sinha specifically asked
    Hatfield if she wanted the courses changed and her only
    response was, "I'll let you know." Instead, she filed a grievance.
    Radson falsely told the committee the issue with Hatfield had to
    be mediated. Radson had no problem with male faculty having
    to have four teaching days per week. Radson's solution was to
    penalize every other faculty member in order to accommodate
    Hatfield rather than allowing Sinha to teach the class.

e.    Radson falsely told the committee that Sinha said Hatfield did
      not appreciate the chain of command.

f.    Most of Sinha's interactions with faculty were face to face.
      Radson had made a comment to do face to face communications
      but a few days later he had mentioned that Sinha should
      communicate via email because it is a faster way to get things
      done.

g.    Radson admitted that Sinha's difficult faculty (older faculty)
      should retire and falsely stated Sinha did not know how to
      handle the faculty.

h.    Radson falsely told the investigators that he was concerned that
      it is difficult to recruit new or good faculty with the current "bad
      faculty". Radson considered the bad faculty to be the older
      professors who refused to retire. Further, if he was concerned
      about recruitment, he would not have instructed Sinha to
      prepare a proposal to bring in a new faculty member.

i.    Radson falsely stated that consultant arrangements blew up
      because of department dysfunction. No such arrangements were
      cancelled.

j.    Radson admitted to the Title IX investigators that he had
      requested Hatfield run for the Chair position; however, in his
      deposition he denied it.

29

k.    All of the statements of conversations Radson claimed he had
with Sinha did not occur.

72.    Radson told the investigators that he was "relying on Patty's
difficulties with Amit to provide evidence that Amit should be removed as Chair."
(Sinha Affidavit, Ex. 6)

73.    Radson used Hatfield's false statements about scheduling, verified
them to be accurate to the grievance committee and Title IX investigators, in order
to secure Sinha's removal as Chair. (Sinha Affidavit, Ex. 6)

74.    After Sinha was removed, Highfill followed the directions from Radson
that Sinha refused to follow. Highfill made the older faculty members work life
difficult and as a result Webster, Rubash and Showers all left Bradley University.

75.    On December 27, 2016 Hatfield filed a charge of discrimination. In her
charge, Hatfield alleged Sinha had discriminated against her on the basis of sex
(Sinha Affidavit, Ex. 6, Ex. D., Hatfield's charge)

76.    On or about March 9, 2017 Bradley responded to Hatfield's charge
denying that Hatfield had been subjected to any unequal treatment in
contradiction of what Hatfield and Radson told the grievance committee and Title
IX investigators. (Sinha Affidavit, Ex. 6, Ex. E., Verified Response).

77.    On March 22, 2017 Sinha was removed as Chair in violation of
Bradley's written procedures. While the Dean may review a Chairperson annually
with a view to recall, the Chairperson shall only be removed if two-thirds of the

faculty members vote in favor of the recall and the Dean concurs. (Sinha Affidavit, Ex. 6, Ex. F, Provision 12 of Bradley Faculty Handbook)

78.    Following Sinha's removal, several faculty wrote letters describing Sinha's performance as Chair contradicting statements made by Hatfield and Radson. (Sinha Affidavit, Ex. 6, Ex. H., Letters).

**E. Sinha's timely charge of the denial of his fall 2017 promotion application.**

79.    Sinha filed two charges of discrimination. EEOC Charge No. 21B-2017-01826 dealt with his removal as Chair of the department. EEOC Charge No. 21B-2018-00855/IDHR Charge No. 2018SF1755, received by IDHR on February 28, 2018, was based on the failure to promote on September 22, 2017. Sinha's charge specifically listed the date of discrimination as September 22, 2017. Bradley responded to EEOC Charge No. 21B-2018-00855/IDHR Charge No. 2018SF1755 claim on May 22, 2018. Bradley referenced the September 22, 2017 promotion denial letter and defended the decision to not promote Sinha. Bradley provided IDHR with Sinha's fall application and all the documents Sinha submitted with his application. (See attached Ex. I, EEOC Charge No. 21B-2018-00855/IDHR Charge No. 2018SF1755, September 22, 2017 promotion denial and Bradley response.)

80.    Two Notices of Right to Sue were attached to Sinha's complaint, including the notice for the September 22, 2017 promotion denial, EEOC Charge No. 21B-2018-00855/IDHR Charge No. 2018SF1755. Paragraph 25 of Sinha's complaint should read "[i]n the fall of 2017 Sinha applied for promotion to full

Professor. The "2016" date was a scrivener's error. Sinha was specifically deposed by Bradley's attorney over his fall 2017 promotion application and denial.

### F. The FQM department was not dysfunctional.

81.    At Bradley's request in October 2017, Sinha appeared on its behalf at a fact-finding conference to refute Hatfield's claims that he had denied her input into her schedule and denied her professional courtesies and harassed her. (Sinha Affidavit, Ex. 6)

82.    Radson's practice of targeting older faculty members and micromanaging the department with directions to Sinha was discussed among faculty members many times. Any dysfunction was the result of Radson's actions and the fact that there was tension between Hatfield and Allen Webster (former spouses), which could not be resolved no matter who was the Chair. (Crowe Affidavit, Ex. 4)

83.    In August 2013, when Amit Sinha was elected as Chair of the department Patricia Hatfield (Webster's ex-wife) also ran in the election to be Chair. Sinha won in a 5-4 vote. Sinha was elected for a second term in August 2016. (Webster Affidavit, Ex. 2)

84.    An election was held after Horvath stepped down as Chair. Horvath abstained from voting because after serving as Chair for six three-year terms. He did not want to influence the election. Sinha and Patricia Hatfield ran for the position. Because a tie vote resulted, another vote was held. Horvath voted in the second election and for Sinha. Horvath did not vote for Hatfield because he did not

think she had the necessary qualities to be a good Chair while Amit possessed the qualities Horvath felt were important. Also, Hatfield exerted intense pressure for to vote for her, reminding Horvath of all the things she had done for him. (Horvath Affidavit, Ex. 3)

85.     After Sinha was removed as Chair in March 2017, Webster wrote a letter to the administration expressing surprise at his removal. Webster said Sinha performed his Chair duties in a professional and responsible, non-discriminatory manner. Webster said Sinha consulted department members about his management decisions and the department experienced significant growth and advancement under his direction. Professor Janett Highfill was appointed by Radson as acting Chair of the department after Sinha was removed. (Webster Affidavit, Ex. 2)

86.     Webster said that while Sinha was Chair, Sinha treated Hatfield the same as all the other department members, but Hatfield carried a grudge against Sinha after she lost the election. (Webster Affidavit, Ex. 2)

87.     Webster said that when Sinha was Chair, their department had the same amount of scheduling problems as other departments at Bradley. (Webster Affidavit, Ex. 2)

88.     Webster said that other than the fact that he did not socialize with his ex-wife, while Sinha was Chair, faculty ate together, socialized and engaged in spirited academic discussions. Webster denies the department was dysfunctional. (Webster Affidavit, Ex. 2)

89.     While Sinha was Chair, Webster said the only dysfunction faculty discussed was Hatfield's resentment of Sinha and Radson's targeting of older faculty. (Webster Affidavit, Ex. 2)

90.     Sinha denied the department was dysfunctional. Members had honest disagreements and robust conversations yet at the same time functioned to carry out its duties such as students obtaining good jobs, textbooks being written, and publishing papers. (Sinha Dep. Ex. 1, pg. 54-55)

91.     Horvath said that after the election, Hatfield displayed animosity to Sinha on many occasions and exhibited behavior describable as a woman scorned. Despite Hatfield's expression of hostility to Sinha, Horvath observed Sinha treat her in a gentle manner. (Horvath Affidavit, Ex. 3)

92.     Horvath's observations about Sinha as Chair contradict the statements by Radson and Hatfield. Horvath said that Sinha would ask each faculty what courses they wanted to teach, receive input, and provide proposed schedules for review. Sinha would converse with all the members of the department and followed the rules in making decisions. Horvath would never describe Sinha's managerial style as demanding the use of "the chain of command." Horvath said that Sinha was hampered as Chair because Radson placed changes and imposed restrictions detrimental to the department. Nonetheless, Sinha was an effective and fair Chair of the department. (Horvath Affidavit, Ex. 3)

93.     Horvath said that claims about Sinha letting him escape his responsibilities is false. In most semesters Horvath served on committees. As Chair

34

Horvath was on the executive committee which met frequently. On one occasion, Horvath declined to take on an additional committee assignment. (Horvath Affidavit, Ex. 3)

94. Horvath said that any complaints Hatfield had about Sinha not assigning her a FIN 622 course are unsupportable. This course required the best instructor in the department qualified to teach it. While Hatfield was a good instructor, Professor El Shahat was a superior teacher and deserved to remain assigned to the course. (Horvath Affidavit, Ex.3)

95. According to Horvath, the FQM department was not dysfunctional. The faculty received good student reviews, publishing was good and they were populating their programs. Horvath said members could have a loud debate on various subjects yet still all end up going out for coffee, which is more than can be said of other departments at Bradley. Certainly, there was tension between Hatfield and Webster after Hatfield and Webster divorced and Hatfield subsequently had a relationship with her graduate student. Besides these personal issues, Hatfield's hostile demeanor after losing the election and Radson's negative actions toward the entire department, there was no dysfunction and certainly no evidence that Sinha was worthy of removal as Chair. (Horvath Affidavit, Ex. 3)

96. Dr. Jennifer Robin (Associate Dean) and Bayaraa Carlson (Data Coordinator), members of the Foster College issued a report finding that the FQM department was highly collaborative. The report stated that in 17 cases, faculty collaborated internally to produce scholarly work, and in many other instances,

faculty have collaborated with people outside Bradley University. (Sinha Affidavit, Ex. 6)

### G. The denial of Sinha's promotion was retaliatory.

97.     Sinha submitted three applications for promotion to full professor in the fall of 2016, 2017, and 2018, each time with the unanimous support from his department. In Spring 2017, Radson would not support Sinha's 2016 application but said he had the credentials for promotion the following year. In Spring 2017, Provost Zakahi denied the 2016 application and advised Sinha that while he could not support the 2016 application, he would support it next year even if Radson opposed it. In July 2017, Sinha filed a charge of discrimination and retaliation with the IDHR and EEOC. Less than two months later, Sinha submitted his second application for promotion to full professor. As the new Chair of the department, Highfill wrote a negative letter regarding Sinha's application. Radson again urged the application be denied. Despite what Zakahi had said about supporting Sinha in 2017, he denied Sinha's application on the basis that Sinha had not used external letters of recommendation as he had the previous year. The rules regarding materials needed in a promotion application did not require external letters of recommendation. Sinha had used external letters in his first application because at that time the application had to meet a higher standard due to the length of his employment at Bradley. (Sinha Affidavit, Ex. 6)

98.     It is not uncommon for a Dean or Provost to tell a promotion applicant to add more materials to the application or make changes to the presentation of the

application before it is finally considered. At no time prior to receiving Radson and Zakahi's denials, was Sinha informed that he needed letters that were not required by the rules to add to an approximate 600-page application. (Sinha Affidavit, Ex. 6)

99.   Sinha's 2018 application for promotion differed little from the one the previous year. However, Radson was no longer Dean and the new Dean recommended Sinha's promotion, which was finally accepted. (Sinha Affidavit, Ex. 6)

**E. But for Radson's actions, Sinha would not have been removed as Chair and his 2017 promotion would have been approved.**

100.   Sinha contacted Bradley President Gary Roberts over his concerns about his removal as Chair. Roberts told Sinha the problems in his department had been resolved by Radson and Provost Zakahi. (Sinha Dep. Ex. 1, pg. 124)

101.   Notwithstanding the Title IX report generated as a result of Hatfield's grievance against Sinha, Nina Peplow, Bradley's HR Director, told Sinha they were not recommending his removal as Chair. (Sinha Dep. Ex. 1, pg. 146-147)

102.   Sinha's removal as Chair did not adhere to Bradley's handbook procedures. (Sinha Dep. Ex. 1, pg. 151, Sinha Affidavit, Ex. 6)

103.   Zakahi discussed Sinha's removal with Radson and Radson did not disagree with the decision to remove him. (Zakahi Dep. Ex. 5, pg. 31)

104.   On March 30, 2017, Provost Zakahi told Sinha he would likely promote him next year even if there was a negative recommendation.  Radson said Sinha had the credentials for promotion with a 2017 application. Sinha was denied

promotion even though the quality of his application had not changed. He had filed a charge of discrimination in the interim. (Sinha Dep. Ex.1, pg. 156-157, 164, Sinha Affidavit, Ex. 6))

105.   The Chairpersons who met with Radson to consider Sinha's 2017 application told Sinha that he had been set up, the system had failed Sinha and they had felt trapped into voting with Radson. (Sinha Affidavit, Ex. 6)

**Argument**

## I.  Standard for Summary Judgment

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A "genuine issue" of material fact in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

38

Courts should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's …[disability] caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id. Ortiz* did not overrule the burden-shifting test created by *McDonnell Douglas.*

## II.  Material Facts Precluding the Entry of Summary Judgment.

Summary Judgment on Count II is inappropriate because Sinha has established credible facts that Radson sought to rid the FQM of its most senior faculty and pressured Sinha to take various actions to force faculty members to retire. Sinha opposed Radson's illegal efforts and was retaliated against.

The evidence shows Radson repeatedly made statements to Sinha that he wanted the most senior faculty members to retire. Radson talked to Webster and Horvath about why they should retire.

Radson refused to give instructor Crowe a teaching contract. When Crowe stated he felt he was the victim of age discrimination, two separate academic bodies questioned whether Radson's actions were legal. Crowe was given a terminal contract and told he could never apply to teach at Bradley. Though Radson had months to provide a reason for this unprecedented action, none was given. Radson demanded that Sinha restructure a course schedule because Sinha's proposed schedule would expose Crowe's termination as unjustified.

Radson urged Sinha to give Bhandari a lousy class schedule so Bhandari would retire.

Radson directed Sinha to deny Rubash an online course so he would retire. Sinha refused to do so. Highfill had no problem following Radson's directive to change the course.

Horvath's Chairmanship of a program was terminated without reason.

Webster was treated in a demeaning manner by both Radson and his new department Chair, Highfill, who promised to do Radson's bidding.

After Radson was specifically told that older faculty members would likely not retire if Sinha was Chair, Radson then used Hatfield's ginned up grievance to validate her false claims and promote the idea that Sinha should be removed as Chair. Indeed, Radson admitted he was relying on Hatfield's complaint to provide evidence Sinha should be removed as Chair.

Reading Hatfield and Radson's statements to the grievance committee and IX investigators, it was a foregone conclusion that there could be no positive findings regarding Sinha's treatment of Hatfield and his competency as Chair. The "resolution" to the problem was provided by the Provost and Radson according to Bradley's president.

FQM faculty denied the charge that the department was dysfunctional in letters written after Sinha's removal and by sworn affidavit. Outside department members of the Foster College reported positively about the collaborative nature of the department leading to significant achievements.

40

Despite being assured that a 2017 promotion application would be approved and after Sinha filed a charge of discrimination, his application was denied because he did not supply letters that were not required by the rules.

Bradley violated the ADEA's anti-retaliation provision providing that it is unlawful for an employer to discriminate against an employee who has opposed any practice made unlawful by the Act. 29 U.S.C. §623(d). An employee states a claim for retaliation under the ADEA when he refuses to carry out discriminatory practices and suffers an adverse employment action as a result. *Blakely v. Big Lots Stores, Inc.*, 833 F.Supp.2d 1042, 1052 (N.D. In. 2011). Further, Sinha's statements to Radson that he would not force older employees to retire constitutes opposition to discrimination. *Crawford v. Metro. Gov't of Nashville and Davidson County,* 555 U.S. 271, 129 S.Ct. 846, 850-51, 172 L.Ed. 2d 650 (2009) (refusal to follow discriminatory orders is statutory opposition).

### III. Sinha's Promotion Retaliation Claim is Not Time Barred.

Bradley argues Sinha's 2016 promotion denial is time barred because a charge was not filed within 300 days. Bradley's argument should be ignored because Sinha has alleged it was the denial of his 2017 promotion application that was an adverse action in retaliation for his opposition to discrimination based on age.

Sinha submitted his second promotion application in the fall of 2017. On September 22, 2017, Chair Highfill wrote a negative letter regarding Sinha's promotion. 159 days later Sinha filed a second charge of discrimination with IDHR and EEOC, his first charge having been solely focused on his removal as Chair. In

his charge, Sinha listed September 22, 2017 as the date of discrimination. EEOC

Charge No. 21B-2018-00855/IDHR Charge No. 2018SF1755, received by IDHR on

February 28, 2018, was based on the failure to promote on September 22, 2017.

Bradley responded to EEOC Charge No. 21B-2018-00855/IDHR Charge No.

2018SF1755 on May 22, 2018. Bradley referenced the September 22, 2017

promotion denial letter and defended the decision to not promote Sinha's after he

applied a second time. Bradley provided IDHR with Sinha's second 2017 fall

application and the documents he submitted with it. Administratively, Bradley

defended the denial of Sinha's second 2017 promotion application.

Sinha thereafter obtained a notice of right to sue over EEOC Charge No. 21B-

2018-00855/IDHR Charge No. 2018SF1755 (the 2017 promotion decision) and

attached it to his complaint in this cause. Both Count I and II reference a promotion

denial after he filed a charge of discrimination. Clearly, Sinha was not referring to

the 2016 promotion denial because he had not filed any charge of discrimination

when the 2016 promotion decision was made. Bradley thoroughly pursued the issue

of the 2017 promotion denial as an adverse employment action in discovery.  Sinha

can only conclude that the allegation in the fact section of his complaint mistakenly

listed the promotion denial using year 2016 instead of year 2017 which then

prompted Bradley's argument in its motion. Regardless, paragraph 25 of Bradley's

undisputed material facts lists Sinha's failure to be promoted as September 22,

2017.[1] Notwithstanding, Bradley had notice of the administrative charges underlying Sinha's complaint and the 2017 promotion decision charge was attached to the complaint and evaluated in this cause.

### IV. Bradley's Explanations for Sinha's Removal as Chair and Promotion Denial are Pretextual.

Bradley claims Sinha's 2017 promotion application was denied because he did not provide letters of support with his application and the FQM department was "dysfunctional" under his leadership. Bradley argues it has legitimate non-discriminatory reasons for its actions against Sinha. The evidence establishes Bradley's reasons were pretextual.

"Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Duncan v. Thorek Memorial Hospital*, 784 F.Supp.2d 910,924 (N.D. Ill. 2011), citing *Kulumani v. Blue Cross Blue Shield Assn*, 224 F.3d 681, 685 ( 7th Cir. 2000). Pretext is established with a showing that: (1) the proffered reasons are factually baseless; (2) the proffered reasons are not the actual motivation for the decision; or (3) the proffered reasons were insufficient to motivate the decision. *Duncan*, supra.

### The dysfunction reason.

The FQM department was labeled dysfunctional after Radson and Hatfield told multiple lies to the grievance committee and IX investigators about Sinha's

---

[1] Sinha's counsel does not imply or infer Bradley's counsel purposely misled this Court. Having known and worked with Bradley's lead counsel for over 25 years, the undersigned would attest to his honesty, integrity and absolute candor with the Court.

actions and statements as well as the functionality or climate within the department. Sinha and multiple faculty members have written and attested to the fact that the FQM department was not dysfunctional. Except for Hatfield's false statements, faculty found Sinha to be a fair and effective Chair.

Radson's motivation to remove Sinha was based on Sinha's refusal to harass older employees using his Chair authority after he was told the older faculty would not retire as long as Sinha was Chair. After removal, Radson installed a Chair who would do his bidding. Radson admitted he used Hatfield's complaint to get Sinha removed. Radson engineered Hatfield's grievance when he denied Sinha the opportunity to resolve the scheduling issue. Hatfield never voiced any of the complaints she conveyed to the grievance committee and investigators until after she lost the election to Sinha and carried a grudge.

Similarly, if Sinha was such a disruptive force within the department, why did Radson not follow the procedures for removal of a Chairperson and have the faculty vote for removal. An employer's failure to follow its own procedures can constitute evidence of pretext. *Jajeh v. County of Cook*, 678 F.3d 560, 572 (7th Cir. 2015). And, if Sinha mistreated Hatfield, why would Bradley have Sinha explain to IDHR why that was not true yet adopt the opposite position here. Zakahi used the grievance committee report and IX investigation report as justification for Sinha's removal. Those reports adopt Radson and Hatfield's claim that Hatfield was mistreated.

**The promotion application missing reference letters reason.**

Sinha's fall 2017 promotion application was denied. Bradley claimed the denial was based on the absence of reference letters that were present in his 2016 application. Sinha's complaint alleges he was denied promotion after filing a charge of discrimination. Sinha did not include reference letters because he no longer had to meet the "rare and extraordinary" requirement in 2017.

Radson conceded Sinha had the credentials for promotion after the denial of his first application. Zakahi assured Sinha in the spring of 2017 that he would promote Sinha even if Radson opposed it.

Bradley's application requirements did not require the submission of external letters.  Neither Radson nor Zakahi asked Sinha to include the letters anyway.

Sinha's 2017 application was unanimously endorsed by his department. Several College Chairpersons said Sinha merited promotion but were pressured to vote with Radson.

The only event occurring after the spring 2017 statements of Radson and Zakahi was Sinha's July 2017 charge of discrimination.

A jury could reasonably infer that Sinha's failure to follow a rule, that did not exist, was pretext for discrimination and the failure to promote him based on his fall 2017 application was a retaliatory adverse action.   A genuine issue of material fact is established if pretext and temporal proximity are established. *Mirocha v. Palos Community Hospital,* 240 F.Supp.3d 822, 846 (N.D. Ill. 2017).

### V. Provost Zakahi's Alleged Good Faith Beliefs Do Not Negate the Causal Connection Between Sinha's Protected Activity and Sinha's Removal as Chair of the FQM department.

To prove Sinha's unlawful retaliation claim under the ADEA, Sinha must show: (1) he engaged in statutorily protected activity; (2) that he suffered an adverse employment action, and (30 that there is a causal connection between the protective activity and the adverse action. *Mirocha*, supra at 240 F.Supp. 822, 846.

Bradley does not dispute Sinha engaged in protected activity or that he was summarily removed as Chair in violation of Bradley's policy. Bradley does not deny Sinha opposed Radson's efforts to oust the elderly members of the FQM department as alleged in Sinha's complaint. Bradley's sole argument is that Zakahi, in good faith, relied on the grievance committee and IX investigator's reports about the dysfunction in the FQM department to remove Sinha as Chair.

*Staub v. Proctor Hospital,* 562 U.S. 411, 131 S.Ct. 1186, (2011) established that if a supervisor performs an act motivated by animus to cause an adverse employment action and the act is the proximate cause of the ultimate employment action the employer is liable. See also, *McDaniel v. Progress Rail Locomotive*, 343 F.Suppp.3d 753, 767 (N.D. Ill. 2018).

Sinha has produced considerable evidence that the grievance committee and Title IX reports simply parroted Radson's false narrative of Sinha's alleged misconduct toward Hatfield and his ineffectiveness as Chair. Zakahi's alleged reliance on reports adopting Radson's recommendations does not break the causal connection between Sinha's protected conduct and the resulting adverse action. The

chain of causation can only be broken if an unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee. *Roberts v. Columbia College Chicago*, 821 F.3d 855, 866 (7th Cir. 2016). Accordingly, Bradley acknowledges that Zakahi used the stated opinions of Radson, as reflected in the two reports, to remove Sinha as Chair. There was no independent review by Zakahi and the evidence shows he blindly relied on the reports of Radson. See *Lindsey v. Walgreen Co.*, 615 F.3d 873 (7th Cir. 2010,(independent investigation breaks causal connection).

The ultimate question is whether the evidence would permit a jury to conclude that Sinha's opposition to the targeting of the oldest faculty members caused his removal as Chair and whether Sinha's filed charge of discrimination caused the denial of his promotion application in the fall of 2017. The answer is yes.

First, there is overwhelming evidence that Radson was biased against the older faculty members and wanted them out of the college. Bradley does not contest this point.

Second, Radson knew that Sinha was an impediment in getting faculty to retire. Radson was told that the older faculty would want to stay at Bradley so long as Sinha was Chair. Radson told older faculty they should retire. Sinha got tired of hearing Radson go on about older faculty needing to retire. Sinha opposed actions against individual faculty members that would make their work difficult. Radson followed through on making older faculty members work difficult when he found a willing Chair. Two older faculty members filed claims of age discrimination.

47

Third, as Sinha's supervisor, Radson made blisteringly false and misleading statements about Sinha's management of the department and supported Hatfield's story that Sinha discriminated against her based on her gender. Radson admitted to the committee he wanted Sinha removed and was using Hatfield's claims as a tool to do so. However, Radson's real problem with Sinha's management of the department was that Sinha would not discriminate against the older faculty. Radson and Hatfield repeated their false stories to the Title IX investigators. Radson's portrayal of a dysfunctional department was the subject of both reports provided to the Provost.

Fourth, Radson's scheme to have Sinha removed as Chair worked. Zakahi met with Radson, read the reports and ordered Sinha removed as Chair. Bradley's president confirmed that Radson and Zakahi resolved their Sinha problem. A jury could reasonably infer that Radson told Zakahi that Sinha had to go. Zakahi was directly and indirectly decisively influenced by Radson. *Roberts*, supra at 865.

Fifth, Sinha was told in March 2017 that his next promotion application would be approved. Sinha's discrimination charge is filed in July 2017. Sinha's fall 2017 application was denied September 2017 for pretextual reasons. There was no requirement that Sinha produce external letters and Zakahi' s critique of the application was different then his 2016 denial even though the applications were nearly identical.

For the reasons set forth above, the evidence would permit a factfinder to conclude that Sinha was retaliated against in the removal of him as Chair and the

48

denial of his 2017 promotion application. Accordingly, summary judgment on Count II should be denied.

Amit Sinha,
    Plaintiff,

By: __/s/ Julie L. Galassi_____
    JULIE L. GALASSI, Esq., Bar No. 6198035
    Attorney for Plaintiff
    HASSELBERG, ROCK, BELL & KUPPLER, LLP
    Suite 200 Associated Bank Building
    4600 N. Brandywine Drive
    Peoria, Illinois 61614-5591
    Telephone:  (309) 688-9400
    Facsimile:  (309) 688-9430
    E-mail:    jgalassi@hrbklaw.com
            aswearingen@hrbklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February *10th*, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

William R. Kholhase
Miller, Hall & Triggs
416 Main Street, Suite 1125
Peoria, Illinois 61602-1161
Email: william.kohlhase@mhtlaw.com

I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

None.

Amit Sinha,
    Plaintiff,

/s/ Julie L. Galassi
JULIE L. GALASSI
HASSELBERG, ROCK, BELL & KUPPLER, LLP
Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone:  (309) 688-9400
Facsimile:  (309)  688-9430
Email:      jgalassi@hrbklaw.com
            aswearingen@hrbklaw.com