UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| AMIT SINHA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 18-1319 |
| | ) |
| BRADLEY UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION

This matter is now before the Court on Defendant Bradley University's ("Defendant") Motion for Summary Judgment. ECF No. 32. For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED.

## BACKGROUND

Plaintiff Amit Sinha ("Plaintiff") was born on July 18, 1970, and was 46 years old during the alleged claims in this matter. ECF No. 36 at 143. In August 2008, Plaintiff was hired as Defendant's employee and was promoted as an associate professor in 2012.[1] During the 2012-2013 academic year, Plaintiff was elected chair of the finance and quantitative methods ("FQM") department. He was also re-elected chair of that department for the 2015-2016 academic year. In the fall semester of 2016, Plaintiff applied to be promoted to the position of full professor. On January 20, 2017, Dean Darrell Radson ("Radson") informed Plaintiff that he was not recommending approval of Plaintiff's application for promotion because he did not find that Plaintiff met the required "rare and extraordinary circumstances" standard since he had been an associate professor for fewer than five years. ECF No. 32 at 5. On March 1, 2017, Dean Radson

---

[1] The remaining facts in the Background section are derived from the Parties' undisputed material facts sections. ECF Nos. 32 at 4-7, 9-11; 37 at 3-6.

1

emailed Plaintiff informing him that Provost Walter Zakahi ("Zakahi") was denying his application for promotion, and on March 5, 2017, Plaintiff acknowledged receipt of that message.

In the fall semester of 2016, Professor Patricia Hatfield ("Hatfield"), a faculty member in the FQM department, filed a grievance against Plaintiff alleging discrimination on the basis of sex. The faculty grievance committee declined to hold a formal hearing on Professor Hatfield's grievance because it thought that such a "process would be drawn out, exceedingly ugly, and would only create further animosity among the current faculty" of the FQM department. *Id.* at 6. The committee reported to President Gary Roberts ("Roberts") that the FQM department had "a long history of dysfunction in faculty relations and departmental leadership. This dysfunctionality has developed into schismatic factionalism and open hostility." *Id.* The committee proposed that one way to resolve Professor Hatfield's grievance would be to remove Plaintiff as chair of the FQM department. Due to concerns of possible gender discrimination, Provost Zakahi referred Professor Hatfield's grievance for a Title IX investigation conducted internally by the university. On February 21, 2017, a report of the Title IX investigation was issued, finding the preponderance of the evidence did not establish that a Title IX violation had occurred. In the report, the investigators further provided that they believed:

> the[] overarching issues have created the dysfunctional environment that is present today. Additionally, it is our concern that this environment will remain in effect going forward unless the Dean . . . and the Provost and Senior Vice President for Academic Affairs take steps to implement changes that will address and mitigate the issues that are within their purview.

*Id.* at 6-7. Upon consideration of the reports from the faculty grievance committee and the Title IX investigators, Provost Zakahi removed Plaintiff as chair of the FQM department.

On July 31, 2017, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the United States Equal Employment Opportunity Commission

("EEOC") alleging that his removal as chair of the FQM department was the result of discrimination on the basis of sex, national origin, and retaliation for objecting to Defendant's discriminatory policy against older employees.[2] The date of the alleged discrimination was March 22, 2017. The charge did not include allegations about the denial of Plaintiff's fall 2016 promotion application, which occurred on March 1, 2017.

In the fall semester of 2017, Plaintiff again applied for a promotion to become a professor. On September 22, 2017, the department chair wrote a letter to Dean Radson forwarding Plaintiff's fall 2017 promotion application. On December 12, 2017, the application was sent to Provost Zakahi. On February 26, 2018, Provost Zakahi wrote to Plaintiff to deny his application stating:

> Hey, I'm disappointed to be writing this letter. I don't think you made a good faith effort in this particular application, the 2017 application; for example, you didn't include external references, you didn't include any description of your teaching philosophy, you didn't include any description of your research programs so your colleagues could understand it.

ECF No. 37-1 at 43. On February 28, 2018, Plaintiff filed a second charge of discrimination with the IDHR and the EEOC alleging that Defendant failed to promote him on September 22, 2017, in retaliation for previously filing a charge of discrimination. In the fall semester of 2018, Plaintiff submitted his third application to be promoted to professor. That application was approved, and Plaintiff was promoted. *Id.*

On August 31, 2018, Plaintiff filed the Complaint in this matter alleging that he was a victim of employment discrimination on the basis of sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000, *et seq.* (Count I) and was retaliated against for opposing age discrimination in his employment in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") (Count II). ECF No. 1. In both counts, Plaintiff alleged the same two adverse

---

[2] Plaintiff contends that Dean Radson and Professor Highfill mistreated older faculty members of the FQM department in attempts to persuade them to retire, and that he refused to cooperate with the alleged mistreatment. *See* ECF No. 1.

employment actions: (1) denial of his application for promotion to the position of professor and (2) removal as FQM department chair. *Id.* On January 20, 2020, Defendant filed a Motion for Summary Judgment. ECF No. 32. On February 10, 2020, Plaintiff filed his response. ECF No. 37. On February 11, 2020, the Parties filed a stipulation advising the Court they agreed to dismiss Count I. ECF No. 38. On February 20, 2020, the Court dismissed Count I. On February 24, 2020, Defendant filed its reply. ECF No. 39. This Opinion follows.

## STANDARD OF REVIEW

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). The moving party may meet its burden by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 322. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322. The court must then determine whether there is a need for trial, in other words, whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 477 U.S. at 249.

## ANALYSIS

### I. ADEA Claim Based on Retaliation for Opposing Age Discrimination

Defendant argues that there is no dispute as to any genuine issue of material fact that Plaintiff was removed as chair of the FQM department solely for the purpose of attempting to improve the dysfunctional department. Defendant further argues that Plaintiff's claims based on the denial of his 2016 promotion application are barred because more than 300 days elapsed between the denial of his application and the filing of his charge with the IDHR and EEOC. If the Court finds the claim is not barred, Defendant argues that there is no evidence from which a reasonable jury could conclude that Plaintiff's 2016 promotion application was denied on the basis that he opposed age discrimination. Plaintiff argues that he has established credible facts that Dean Radson sought to rid the FQM department of its most senior faculty and pressured Plaintiff to take various actions to force said faculty to retire. When Plaintiff refused, he claims that he was denied a promotion and removed as chair of the department. Moreover, Plaintiff states that his claim related to the promotion denial is not time barred because he claims it was his second promotion denial from 2017, not the 2016 denial, that forms the basis of his claim. According to Plaintiff, the promotion denial from 2017 was within the 300 days statute of limitations.

#### A. Time Bar

To sue under the ADEA, an employee must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. 29 U.S.C. § 626(d)(1)(B); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). The date of the unlawful practice "is when a 'final, ultimate, [and] non-tentative' decision was made for which the employee receives unequivocal notice." *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011) (quoting

*Flannery*, 354 F.3d at 637). Failure to timely file a charge with the EEOC will ordinarily bar an ADEA claim. *Chakonas v. City of Chicago*, 42 F.3d 1132, 1135 (7th Cir. 1994).

Here, Plaintiff filed a charge of discrimination with the IDHR and EEOC on two separate occasions. On July 31, 2017, Plaintiff filed his first charge with both agencies alleging that his removal as chair of the FQM department was a result of discrimination and retaliation for objecting to Defendant's discriminatory policy against older employees. The date of the alleged discrimination was March 22, 2017. This was within the 300-day requirement. The charge did not include allegations about the denial of Plaintiff's 2016 promotion application for the position of professor, which occurred on March 1, 2017. Accordingly, Plaintiff had until December 26, 2017, to file his charge with the IDHR and EEOC regarding the 2016 promotion application, but he failed to do so.

On February 28, 2018, Plaintiff filed his second charge with both agencies, alleging that Defendant failed to promote him on September 22, 2017, in retaliation for filing a charge of discrimination. While this second charge did mention a promotion, it referred to Plaintiff's 2017 promotion application. Plaintiff's filing was timely for the 2017 promotion application since it was filed 159 days after the alleged date of discrimination, but it occurred more than 300 days after March 1, 2017, when he was informed his 2016 promotion application was denied.

Plaintiff's Complaint alleges that "[i]n the fall of 2016 Sinha applied for promotion to full Professor . . . Radson, without citing any reason, informed Sinha that he would not recommend him for promotion to the position of full Professor at that time." ECF No. 1 at 5. There was no mention of his 2017 promotion application. Plaintiff claims that the 2016 date in the Complaint was a "scrivener's error." ECF No. 37 at 32. Plaintiff also confirms that he did not file any charge of discrimination when his 2016 promotion application was denied. Instead, he contends that the

6

Complaint was intended to be regarding the 2017 promotion denial and that Defendant "thoroughly pursued the issue of the 2017 promotion denial as an adverse employment action in discovery." *Id.* at 42. The Court, however, finds that this is not the case. In reviewing the submitted discovery, the Court did not find any questions aimed at Plaintiff's 2017 promotion denial. For example, Defendant's request to admit stated: "Plaintiff has no personal knowledge that his sex was a motivating factor in his . . . denial of his August 2016 application for promotion to full professor," to which Plaintiff denied. ECF No. 36 at 44. That same discovery also had the following two requests to admit: (1) "Bradley Provost Walter Zakahi made the decision to deny Plaintiff's application for promotion to full professor which Plaintiff initiated in August of 2016," and (2) "In determining to deny the application for promotion to full professor that Plaintiff initiated in August of 2016, Bradley Provost Walter Zakahi acted with the honest belief . . ." *Id.* at 149. During Plaintiff's deposition, Defendant asked questions related to all three of his promotion applications from 2016, 2017, and 2018. The most telling testimony from Plaintiff, however, is reflected in the following exchange:

> Q: Your position, however, is that you should have been promoted earlier, correct?
>
> A: That's correct.
>
> Q: And your position *in this case* is your 2016 application should have been allowed, correct?
>
> A: That's correct.

ECF No. 37-1 at 43. (emphasis added). Plaintiff clearly confirmed that he was pursuing his claims based on his initial promotion denial from 2016. As it can be seen, Defendant also did not thoroughly pursue the 2017 application denial in discovery. Plaintiff had ample opportunities to

7

amend his "scrivener's error," or clarify that he was pursuing the 2017 application denial but failed to do so. In fact, no objection was raised, and no attempt to clarify was made, when Plaintiff testified during his deposition that his position in this case was regarding the 2016 application. Therefore, the Court finds Plaintiff's arguments that he has been pursuing the 2017 promotion denial in this matter unpersuasive.

The Court has considered whether the continuing violation doctrine is applicable to the time-barred allegations. However, the factual basis for Plaintiff's claim demonstrates that the alleged denial of promotion involved specific discrete employment decisions. *See Lewis v. City of Chicago*, 528 F.3d 488, 493 (7th Cir. 2008) (internal citations omitted) (observing that the continuing violation doctrine allows an individual to delay suing until a series of acts by a prospective defendant blossoms into a wrongful injury on which a suit can be based.). Unlike cumulative discriminatory acts, which occur "over a series of days or perhaps years" and "arise when it is not immediately apparent that the law is being violated," discrete discriminatory acts occurs on a particular day that it happened." *Plata v. Eureka Locker, Inc*., 2015 WL 13590120, at *4 (C.D. Ill. Feb. 6, 2015) (internal citations and quotations omitted). Each discrete discriminatory act, such as failure to promote, will start a new clock for filing charges and only those acts occurring within 300 days are actionable. *Id.*

Here, the alleged discriminatory acts of denial of promotion were discrete acts with particular dates of occurrence – March 1, 2017, and September 22, 2017. Therefore, only those acts occurring within 300 days before the filing of the charge of discrimination are actionable. Plaintiff failed to file a charge with either the IDHR or the EEOC within 300 days of the denial of his 2016 promotion application; he only alleged a claim in this case regarding that denial. Plaintiff

8

cannot backtrack his claims at the summary judgment stage in order to circumvent the 300-day requirement.

Accordingly, the Court concludes that Plaintiff's claim regarding a violation of the ADEA for failure to promote him to professor in 2016 is time barred. The Court will continue its analysis as it relates to Plaintiff's allegation that Defendant retaliated against him when it removed him as chair of the FQM department because he opposed age discrimination.

### B.    Cat's Paw Theory

The ADEA protects individuals who are 40 years old or older from employment discrimination based on opposition to their employer's unlawful practices. 29 U.S.C. §§ 623(d), 631(a). A terminated employee may prevail in an ADEA-based claim if he shows that an adverse action would not have occurred but for his employer's discriminatory motive. *Pitasi v. Gartner Grp. Inc.*, 184 F.3d 709, 714 (7th Cir. 1999). In analyzing ADEA claims on summary judgment, the courts must determine "whether the evidence would permit a reasonable factfinder to conclude" that plaintiff's opposition to his or her employer's unlawful practices "caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016).

A plaintiff may survive summary judgment by presenting direct or circumstantial evidence sufficient enough to establish or to create an inference of intentional discrimination. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010) (internal citation omitted). Circumstantial evidence requires the finder of fact to infer intentional discrimination, while direct evidence is that which proves a fact without requiring an inference. *Lewis v. Sch. Dist. No. 70*, 523 F.3d 730, 742 (7th Cir. 2008). In practice, direct evidence would require something such as an admission by Defendant that it removed Plaintiff as chair of the FQM department because of his opposition to

Dean Radson's efforts to rid the department of older faculty members. Circumstantial evidence, meanwhile, would allow Plaintiff to defeat a motion for summary judgment if he established a prima facie case of retaliation. *See Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020). Plaintiff may also employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* approach, "the plaintiff must show evidence that (1) [he or] she is a member of a protected class, (2) [he or] she was meeting the defendant's legitimate expectations, (3) [he or] she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *McDaniel v. Progress Rail Locomotive, Inc.,* 940 F.3d 360, 368 (7th Cir. 2019) (internal quotation omitted). Where plaintiff makes such a showing, the defendant may articulate a "legitimate, nondiscriminatory reason for the adverse employment action," and plaintiff then has the burden of showing that the employer's explanation is pretextual. *Id.* "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age." *Skiba v. Illinois Cent. R.R. Co*., 884 F.3d 708, 720 (7th Cir. 2018) (internal quotation omitted); *see also McDaniel*, 940 F.3d at 368.

Even where there is no evidence of animus on the part of the final decisionmaker, a plaintiff may prevail if he can establish that another employee, who did harbor such bias, exercised controlling influence (the "cat's paw" doctrine). *Johnson v. Koppers*, 726 F.3d 910, 914 (7th Cir. 2013). Thus, when "a biased subordinate who lacks decision-making power uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action," the employer may be liable. *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) *overruled on other grounds* by *Ortiz,* 834 F.3d 760 (internal quotations omitted). For the "cat's paw" theory to

succeed, however, a plaintiff must provide "evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) (internal citations omitted).

Plaintiff contends that he has produced indirect evidence that shows Plaintiff opposed Dean Radson's efforts to oust elderly members of the FQM department, and as a result, he was removed as chair. Defendant argues Plaintiff has not provided any evidence to show that Provost Zakahi, who was the decision maker in this instance, had a retaliatory motive when he removed Plaintiff as chair. The Court finds that there is no evidence of animus on the part of Provost Zakahi, nor can Plaintiff advance a cat's paw theory that Dean Radson's alleged bias was the proximate cause of his removal as chair of the FQM department.

Provost Zakahi testified to the following at his deposition:

Q: Did Radson recommend Sinha's removal as chair?

A: No.

Q: Did you discuss it with him?

A: Almost certainly.

Q: What did he say if, anything?

A: I - the way this would have happened is I would have brought it to him. It was my idea. He didn't disagree with me.

Q: So I misunderstood you. He did not disagree?

A: Right.

. . .

Q: Is it your testimony that it was your sole decision to remove Sinha as chair?

A:      Yes.

ECF No. 37-5 at 10. Provost Zakahi went on to confirm that his decision to remove Plaintiff as chair was based on the findings of the faculty grievance committee and Title IX investigations:

A:      So after I read Exhibit 2 [Title IX investigation report] I came to the conclusion that the department was not in a position to lead itself any longer and that we needed to appoint an outside department chair in order to try and move the department in a more positive direction.

Q:      Is that a conclusion that you reached on your own?

A:      With – yes, with the help of these documents.

Q:      And these documents is Exhibit 1 [faculty grievance committee report] and Exhibit 2 [Title IX investigation report]?

A:      That's correct.

Q:      In reaching that conclusion did you rely on any factual information that was provided to you by Darrell Radson?

A;      No.

*Id.* at 12. As evidenced by his testimony, when making the decision to remove Plaintiff as chair, Provost Zakahi held no animus. Plaintiff does not refute as much either and focuses his arguments on Dean Radson's actions surrounding his bias influencing Provost Zakahi to remove Plaintiff as chair of the FQM department. Plaintiff claims that "[a] jury could reasonably infer that Radson told Zakahi that Sinha had to go;" however, the Court finds that not to be the case. Plaintiff has not produced any evidence that Dean Radson harbored discriminatory animus against him. There may have been circumstantial evidence that Dean Radson wanted older faculty members to retire, such as, asserting that they would never retire if they were allowed to teach online courses,

opposing professors' requested courses, and complaining of them generally, but nothing reflected that Dean Radson discriminated against Plaintiff for refusing to implement methods in order to get older faculty to retire. ECF Nos. 37-1 at 6, 10, 13, 24, 28, 30; 37-4 at 3-4. Even assuming *arguendo* that Dean Radson harbored animus against Plaintiff for refusing to implement methods to get older faculty to retire, there is no evidence that Dean Radson's alleged animus was the proximate cause of the adverse employment action.

Provost Zakahi clearly testified that his decision to remove Plaintiff as department chair was based on both the faculty grievance committee and Title IX reports. The investigations and reports were generated as a result of a complaint made by Professor Hatfield in the FQM department against Plaintiff for alleged gender discrimination. The report confirms that the committee spoke to Dean Radson during their investigation. In the report, Dean Radson is quoted as stating that "Professor Sinha refuses to act in reasonable and conciliatory ways, instead exacerbating the problems by his arbitrary and dictatorial actions … 'suggestions to Dr. Sinha tend to fall on deaf ears.'" ECF No. 36 at 31. According to the committee report, Dean Radson recommended breaking up the FQM department and distributing its faculty to other departments. Near the end of the report, the committee recommended that Plaintiff should be removed as chair. *Id.* Dean Radson was not on the committee, and according to the report, did not make a recommendation to remove Plaintiff as chair. He did say unflattering remarks about Plaintiff, but the report does not reflect that the committee was influenced solely by those remarks. Instead, the committee's recommendations were influenced by materials submitted by Professor Hatfield, as well as the results of interviews with Professor Hatfield, Plaintiff, and Dean Radson. The recommendations included the following: (1) Professor Hatfield being moved to another department; (2) Professor Hatfield being moved to a "department of one;" (3) having tuition

13

remission for her children if Professor Hatfield left her employment with Defendant; (4) having Plaintiff and other members of the FQM department be given oversight by Dean Radson or his representative; (5) counseling or instruction in appropriate behavior for Plaintiff and other members of the department who may be perpetuating a negative environment; (6) removing Plaintiff as chair; (7) members being told that if there are any other verifiable complaints about their behavior, there would be consequences; (8) senior faculty who participate and perpetuate the problems alleged by Professor Hatfield should be encouraged to retire; and, (9) the FQM department could be disbanded and its members moved to other departments. Despite Plaintiff being interviewed as part of the investigation, the committee still concluded that he should be removed as chair, among other items, to address issues within the department. Reviewing the report, it cannot be said that Dean Radson duped the committee into writing the foregoing recommendations, which ultimately lead to Provost Zakahi removing Plaintiff as chair of the FQM department.

Additionally, the Title IX investigation and report concluded: "[o]ur investigation confirmed a pervasive atmosphere of unprofessionalism among colleagues within the Department and the College. Unprofessional exchanges were evidenced in emails, verbal conversations and behavioral interactions." *Id.* at 36. The report expressed concern that the dysfunctional environment would persist unless the dean, provost, and senior vice president "took steps to implement changes that will address and mitigate the issues that are within their purview." *Id.* at 37. The investigators interviewed ten individuals, including Professor Hatfield, Plaintiff, and Dean Radson, and reviewed documentation previously provided by Professor Hatfield to the faculty grievance committee. While the investigation concluded there was no gender discrimination, it did find that there was "dysfunction that has plagued the department." *Id.* at 37. Again, there was no

14

indication from the Title IX investigation report that Dean Radson had influenced their conclusion regarding the FQM department. Therefore, two separate investigations conducted by different groups of individuals came to the same conclusion – the FQM department was dysfunctional and changes needed to be made to address the issues that came to light. Accordingly, Provost Zakahi made the decision to remove Plaintiff as chair.

The record fails to demonstrate that Dean Radson influenced Provost Zakahi, the decisionmaker, to remove Plaintiff as chair. Accordingly, Defendant's Motion for Summary Judgment is granted as to this claim.

## CONCLUSION

For the reasons stated above, Defendant's [32] Motion for Summary Judgment is GRANTED. The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff. This case is now TERMINATED.

ENTERED this 23rd day of April, 2020.

                                                    /s/ Michael M. Mihm
                                                    Michael M. Mihm
                                              United States District Judge